UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

MYLIEK T. LEBRON,

                Petitioner,

v.                                            9:22-CV-0010
                                                    (MAD/ML)

SUPERINTENDENT UHLER,

                Respondent.

---

APPEARANCES:                                                         OF COUNSEL:

MYLIEK T. LEBRON
Petitioner, pro se
16-A-3424
Greenhaven Correctional Facility
P.O. Box 4000
Stormville, NY 12582

HON. LETITIA JAMES                                JALINA J. HUDSON, ESQ.
Attorney for Respondent                         Ass't Attorney General
New York State Attorney General
The Capitol
Albany, New York 12224

MIROSLAV LOVRIC
United States Magistrate Judge

**REPORT-RECOMMENDATION and ORDER**

**I.    INTRODUCTION**

    Petitioner Myliek LeBron seeks federal habeas relief pursuant to 28 U.S.C. § 2254. Dkt. No. 1, Petition ("Pet.").[1] On January 20, 2022, this Court issued an Order directing respondent to answer the petition. Dkt. No. 6, Decision and Order ("January Order").

---

[1] With the exception of the State Court Record, Dkt. No. 14-2, which was separately paginated via Bates Stamp markings in the bottom-center of each page, citations to parties' filings refer to the pagination generated by CM/ECF, the Court's electronic filing system.

Instead, respondent requested, and was granted permission, to file a motion to dismiss. Dkt. No. 12, Letter Motion (requesting to file a motion to dismiss in lieu of an answer); Dkt. No. 13, Text Order (granting letter motion); Dkt. No. 14, Motion to Dismiss; Dkt. No. 14-1, Memorandum of Law in Support of the Motion; Dkt. No. 14-2, State Court Record ("SCR").

In response, petitioner filed a letter. Dkt. No. 16. In it he said that he "d[id] not wish to respond [substantively] to the Respondent's . . . motion to dismiss." *Id.*

## II. RELEVANT BACKGROUND

As is relevant to the instant action, and as summarized by the New York State Appellate Division, Third Department, the facts underlying petitioner's criminal conviction are as follows:

> In June 2015, Lasean Gause (hereinafter the victim) was killed when two assailants shot at a group of people standing outside a grocery store in the City of Schenectady, Schenectady County.
>
> . . .
>
> The testimony of the People's witnesses established that [petitioner] had been "jumped" in an attack by multiple younger individuals several days earlier. In a video recording made shortly after the attack, [petitioner] vowed revenge and specifically mentioned a person called "J Savage." On the evening of the shooting, a group that included [petitioner], James, Sayles, Aaron Ketchmore and a female friend of [petitioner] (hereinafter the friend) gathered on the street outside [petitioner]'s home. According to the friend, Ketchmore mocked [petitioner] for having been attacked by younger boys and said that if he had been attacked, he would have done something about it and "shot at people." Sayles testified that Ketchmore criticized [petitioner] for failing to "handle [his] business" by responding to the attack, and told him that his inaction "ma[de the neighborhood] look bad. Ketchmore said something about going to get a gun. He and [petitioner] briefly departed, rejoining the group after about five minutes.
>
> Sayles then drove [petitioner] and the friend around the area in

Sayles' silver Chrysler, driving past a park and the store where the shooting later occurred. The friend said that [petitioner] wanted "[t]o see if anyone was outside that he had problems with." Sayles testified that [petitioner] wanted to know if anyone who had been involved in the attack – in particular J Savage – was in the park, but that it was too dark to see. When the vehicle returned "uptown," [petitioner] asked Sayles for James' telephone number. According to the friend, [petitioner] wanted to make calls "to find someone else that had a gun to ride with him because he didn't want to go [back to the park] alone." James then passed by in another vehicle, and [petitioner] flagged him down and told him to get into the Chrysler. According to Sayles, [petitioner] told James that he thought that J Savage and others might be in the park. Sayles drove [petitioner] to his home, where [petitioner] went inside briefly and returned wearing a hooded sweatshirt. The friend testified that either [petitioner] or James then said something about going to James' house to get another gun. Sayles drove to James' home, where James put on a hooded sweatshirt with distinctive markings. They drove past the park again, but saw only children there. James asked [petitioner] how he could have thought that J Savage was in this group, and complained that [petitioner] "had [him] all amped up for no reason."

Sayles then drove past the grocery store, where people were standing outside. According to the friend, [petitioner], who was a member of the Crips gang, saw two men who were known to be members of the Bloods gang, and said that they were "the guys that said [that] when they see [petitioner] they're going to jump [him]." Sayles testified that [petitioner] said that he recognized someone and asked Sayles to stop. At [petitioner]'s direction, Sayles parked the vehicle around the corner of a nearby street, and [petitioner] and James exited, putting their hoods up. According to Sayles, [petitioner] said that he "might have to shoot at that guy," meaning the person he had recognized. [Petitioner] asked James if he was ready to go, and he and [petitioner] walked toward the store.

About two minutes later, Sayles and the friend, who had remained in the car, heard gunshots coming from the direction of the store. James and [petitioner] ran to the car and got in. As Sayles drove away, he said that he hoped that James and [petitioner] had not fired the gunshots, and [petitioner] responded that he "had to let off at somebody." [Petitioner] said that "he [did]n't want it to be obvious," took down his hood and reclined his seat. As the group drove around the park and back past the store to see if there had

3

> been any police response, James and [petitioner] repeatedly said that they did not know if they had hit anyone. According to Sayles, James said that he did not know what person [petitioner] had meant for him to shoot at, and that he had just shot at whoever was at the store, "empt[ying] out his clip." [Petitioner] responded that he had intended for James to target a man wearing a red hoody or a red hat.
>
> Sayles then drove the vehicle to the street outside [petitioner]'s house, where [petitioner] told Ketchmore that he "just had to lit up [the store]" and that "he let it go on somebody at [the store], he [saw] somebody over there." The group then entered [petitioner]'s house, where, according to Sayles, [petitioner] said that he had seen someone at the store who had been involved in another attack on him a year earlier, and that [petitioner] had felt the need to shoot at him. [Petitioner] said that he had shouted this individual's name, that the person had started running and that he and James had shot at him but knew that they had not hit him. James and [petitioner] each removed a gun from their hoody pockets and put them on the table, and [petitioner] told Ketchmore that he had fired several shots before his gun jammed. Later, [petitioner] used his phone to search for news about the shooting and told the friend that he had learned that the victim had been killed. According to the friend, [petitioner] seemed surprised and "mad," but not remorseful, and said that he had been trying to shoot the two men he had identified as Bloods.

*People v. Lebron*, 166 A.D.3d 1069, 1070-72 (3rd Dep't 2018). The prosecution also admitted "surveillance video and audio recordings that, among other things, showed Sayles' car passing by the grocery store in the moments just before the shooting, followed by James and [petitioner] walking toward the store and then fleeing a few moments later." *Id.* at 1072. The story was further corroborated by "recordings of bystanders running away at the sound of multiple gunshots," and testimony from witnesses who saw petitioner, identified by his distinctive hoody, "with his arms extended and 'flashes' coming out of the extended arm," running from the scene, and entering a Chrysler. *Id.* at 1072-73.

Ultimately "it was not possible to identify the [bullet] that had struck the victim, and the

4

guns were not recovered;" however, a forensic scientist testified that based on the markings on the bullets two guns were used to fire into the crowd and those types of guns were "consistent" with what witnesses saw petitioner and James use. *Lebron*, 166 A.D.3d at 1073. Further, petitioner's recorded police statement showed that "after initial denials, [petitioner] admitted his presence at the shooting scene but claimed that he was armed only with a BB gun[.]" *Id.* Finally, a letter, written by petitioner to the victim's family, was produced wherein petitioner "said that he was writing to apologize, but added that he was not solely responsible as the victim should have been provided better medical care. *Id.*

On his direct appeal, petitioner argued that he was entitled to relief because (1) the County Court violated a statutory requirement that jurors immediately be sworn in after their selection; (2) his conviction was against the weight of the evidence; (3) petitioner's level of culpability was incorrectly determined given the fact that James was convicted of second degree manslaughter; (4) the trial court erred in allowing Sayles to testify about a conversation he heard where petitioner sought more drugs because the testimony was unfairly prejudicial; and (5) the sentence was harsh and excessive. SCR at 4-46. The People opposed the appeal. SCR at 372-398.

The Third Department affirmed petitioner's judgment of conviction. *Lebron*, 166 A.D.3d at 1074. Specifically, the Third Department held that petitioner failed to preserve his claim about the jury and that, even if he had, it amounted to "a technical error . . . that did not go to the essential validity of the proceedings conducted below such that the entire trial was irreparably tainted." *Id.* at 1070 (internal quotation marks and citations omitted). Second, the Third Department discussed the overwhelming proof supporting petitioner's conviction. *Id.* at 1070-73. Moreover, petitioner's contention that he was incorrectly convicted of second

5

degree murder was unpersuasive because

> the People submitted evidence that [petitioner] intended to target a certain individual or individuals . . . [therfore, e]ven if a different verdict would not have been unreasonable, upon now viewing the evidence in a neutral light and giving the appropriate deference to the jury's credibility assessments, . . . th[e] verdict was not against the weight of the evidence.

*Id.* at 1073. As to the trial court's ruling on the testimony regarding petitioner seeking drugs, the Third Department determined that "the testimony should not have been admitted . . . [n]evertheless, in light of the overwhelming nature of the other evidence, . . . there is no significant probability that [petitioner] would have been acquitted if this brief testimony had not been admitted and, thus, the error was harmless." *Id.* at 1074. Finally, the Third Department found "no abuse of discretion or extraordinary circumstances warranting a reduction [in petitioner's] sentence in the interest of justice," given the seriousness of the crime and petitioner's failure to accept responsibility. *Id.*

Petitioner applied for leave to appeal; however, on January 3, 2019, the New York State Court of Appeals denied the application. Pet. at 2-3; SCR at 569-571; *People v. LeBron*, 32 N.Y.3d 1174 (2019). Petitioner did not file a petition for a writ of certiorari or otherwise collaterally attack his state court conviction. Pet. at 3.

On or about November 22, 2021, petitioner applied for resentencing pursuant to New York Criminal Procedure Law § 440.47. SCR at 578-580. On March 25, 2022, the County Court provided petitioner with an attorney so that counsel could submit an application for resentencing. SCR at 584. It is unclear what the present procedural posture of that action is.

**III.   THE PETITION**

Petitioner challenges a 2016 judgment of conviction in Schenectady County, upon a jury verdict, of second degree murder and four counts of second degree criminal possession of a weapon. Pet. at 1-2; *see also People v. LeBron*, 166 A.D.3d 1069, 1069 (3rd Dep't 2018). Petitioner argues that he is entitled to federal habeas relief because (1) the conviction was supported by legally insufficient evidence, Pet. at 3-4; (2) the trial court erred in admitting "immaterial and irrelevant facts that w[ere] prejudicial and deprived petitioner of a fair trial," *id.* at 4-5; (3) the trial court erred "in delaying the mandatory swearing [in] of selected trial jurors and deprived petitioner of a fair trial," *id.* at 5-6; and (4) the sentence was harsh and excessive, *id.* at 6. The petition was signed and placed into the facility mailing system on January 2, 2022. *Id.* at 9.

## IV.   DISCUSSION

Respondent moves to dismiss the petition, pursuant to Fed. R. Civ. P. 12(b)(6), on the ground that it fails to state a claim upon which habeas corpus relief may be granted. Dkt. No. 14. Specifically, respondent contends that the petition is untimely and cannot be tolled. Dkt. No. 14-1 at 16-22. While petitioner declined to respond to the motion, Dkt. No. 16, he previously admitted his petition was untimely yet saved by an equitable exception, Pet. at 8. For the following reasons, the Court recommends granting respondent's motion and denying and dismissing the petition as time-barred.

### A.   One-Year Statute of Limitations

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), enacted on April 24, 1996, established a one-year statute of limitations for prisoners to seek federal review of their state court criminal convictions. 28 U.S.C. § 2244(d)(1). The one-year period generally begins to run from the date on which the state criminal conviction became final by

the conclusion of direct review or by the expiration of the time to seek direct review. 28 U.S.C. § 2244(d)(1)(A); *Gonzalez v. Thaler*, 565 U.S. 134, 149-50 & n.9 (2012).[2]

For purposes of section 2244, a state conviction becomes "final" when the United States Supreme Court denies an application for a writ of certiorari or when the time to seek certiorari has expired, which is ninety days after the date on which the highest court in the state has completed direct review of the case. *Gonzalez*, 565 U.S. at 150; *Saunders v. Senkowski*, 587 F.3d 543, 547-49 (2d Cir. 2009).

In this case, as petitioner indicates in his petition, his conviction was affirmed by the Court of Appeals on January 3, 2019. Pet. at 3; *Lebron*, 32 N.Y.3d at 1174. Petitioner's conviction became "final" for purposes of the AEDPA ninety days later, on April 3, 2019, when the time to seek certiorari expired. *Thaler*, 565 U.S. at 149. Petitioner had one year from that date, or until April 2, 2020, to file a timely federal habeas petition. The present petition, executed on January 2, 2022, was filed one year and nine months too late.[3]

## B. Statutory Tolling Does Not Save The Petition.

The one-year limitation period under AEDPA is tolled while "a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending." 28 U.S.C. § 2244(d)(2); *Saunders*, 587 F.3d at 548. The tolling provision "excludes time during which properly filed state relief applications are pending, but does not

---

[2] Other dates from which the limitations period may start running are the date on which an unconstitutional, state-created impediment to filing a habeas petition is removed, the date on which the constitutional right on which the petitioner bases his habeas application was initially recognized by the Supreme Court, if the right was newly recognized and made retroactively applicable, or the date on which the factual predicate for the claim or claims presented could have been discovered through the exercise of due diligence (newly discovered evidence). 28 U.S.C. § 2244(d)(1)(B)-(D). None of the bases for a later date upon which the statute of limitations could have begun to run appear to apply in this case.

[3] Under the prison "mailbox rule," a petitioner's application is deemed filed on the date he delivers it to the prison authorities for mailing. *Houston v. Lack*, 487 U.S. 266, 270 (1988)

reset the date from which the one-year statute of limitations begins to run." *Smith v. McGinnis*, 208 F.3d 13, 17 (2d Cir. 2000) (per curiam). The tolling provision excludes from the limitations period only the time that the state relief application remained undecided, including the time during which an appeal from the denial of the motion was taken. *Saunders*, 587 F.3d at 548; *Smith*, 208 F.2d at 16.

Petitioner's application for resentencing, pursuant to New York Criminal Procedure Law § 440.47, was filed on or about November 22, 2021. SCR at 578-80. Assuming this was a properly filed collateral attack, it still has no bearing on the present analysis because the application was commenced over a year and a half beyond the termination of the limitations period and an application for collateral relief cannot serve to "revive [an] expired statute of limitations." *Gillard v. Sticht*, No. 9:16-CV-0513 (MAD), 2017 WL 318848, at *3 (N.D.N.Y. Jan. 23, 2017) (citations omitted); *accord, Roberts v. Artus*, No. 1:16-CV-2055, 2016 WL 2727112, at *2 (E.D.N.Y. May 5, 2016) ("If the 440 motion was filed after the one-year statute of limitations period expired, it cannot be counted for purposes of statutory tolling.").

**C.   Equitable Tolling Does Not Save The Petition.**

AEDPA's one-year statute of limitations period "is subject to equitable tolling in appropriate cases." *Holland v. Florida*, 560 U.S. 631, 645 (2010) (citing, *inter alia*, *Smith* 208 F.3d at 17). The Second Circuit has "set a high bar to deem circumstances sufficiently 'extraordinary' to warrant equitable tolling." *Dillon v. Conway*, 642 F.3d 358, 363 (2d Cir. 2011). A petitioner must show "'(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way' and prevented timely filing." *Id.* at 649 (quoting *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005)); *see also Diaz v. Kelly*, 515

F.3d 149, 153 (2d Cir. 2008).

To make the requisite showing, a petitioner must "demonstrate a causal relationship between the extraordinary circumstances on which the claim for equitable tolling rests and the lateness of his filing[.]" *Rodriguez*, 2015 WL 5968837, at *6 (quoting *Hizbullahankhamon v. Walker,* 255 F.3d 65, 75 (2d Cir. 2001)). Further, a petitioner must establish that he "acted with reasonable diligence throughout the period he seeks to toll." *Doe v. Menefee*, 391 F.3d 147, 159 (2d Cir. 2004). "The link of causation is broken if the person seeking equitable tolling has not exercised reasonable diligence." *Rodriguez,* 2015 WL 5968837, at *6 (citing *Barrett v. United States*, 961 F. Supp. 2d 403, 408 (D. Conn. 2013)); *see also Hizbullahankhamon,* 255 F.3d at 75; (noting that causal relationship cannot be demonstrated "if the petitioner, acting with reasonable diligence, could have filed on time notwithstanding the extraordinary circumstances").

Petitioner fails to make any such argument that he is entitled to equitable tolling. Instead, petitioner solely states that the miscarriage of justice provision renders his present petition timely. Pet. at 8.

Even if petitioner were to attempt to proffer that equitable tolling did apply, he fails to allege any facts that would warrant extraordinary circumstances or a causal relationship. Petitioner does not allege that any circumstances prevented him from seeking timely relief in this Court.

### D.     No Equitable Exception Saves the Petition.

Petitioner acknowledges that his petition is time-barred. Pet. at 8. "However, [petitioner is] making a claim of 'actual innocence' . . . towards the intentional murder charge," and he is "asking this Court to invoke it's [*sic*] 'miscarriage of justice' exception[.]"

10

*Id.* Petitioner also confesses that he is "not presenting newly discovered evidence within th[e] petition[,]" yet still asks that the Court "dismiss[ the] intentional murder charge and . . . modif[y the] sentence[.]" *Id.*

Courts have also recognized an equitable exception to the one-year statute of limitations under 28 U.S.C. §2244(d)(1) in cases where a petitioner can prove actual innocence. *McQuiggin v. Perkins*, 569 U.S. 383, 386 (2013). It is important to stress that "[o]nce guilt is . . . established . . . a federal habeas court will not relitigate the question of guilt for a state defendant who protests his actual innocence . . . [r]ather, a federal habeas court will review state convictions for constitutional error." *Hyman v. Brown*, 927 F.3d 639, 656 (2d Cir. 2019).

An actual innocence claim will be recognized only in a "narrow class of truly extraordinary cases [where a petitioner can] present[] credible and compelling claims of actual innocence." *Hyman*, 927 F.3d at 656 (citing *Schlup*, 513 U.S. at 315) (internal quotation marks omitted); *see also House*, 547 U.S. at 538 (noting that the actual innocence gateway standard is "demanding and permits review only in the extraordinary case.") (internal quotation marks omitted). "The petitioner's burden in making a gateway showing of actual innocence is deliberately demanding." *Hyman*, 927 F.3d at 656 (citing cases). "To be credible, such a claim requires petitioner to support his allegations of constitutional error with new reliable evidence–whether it be exculpatory scientific evidence, trustworthy eyewitness accounts or critical physical evidence–that was not presented at trial." *Schlup*, 513 U.S. at 324; *see also Rivas v. Fischer*, 687 F.3d 514, 518 (2d Cir. 2012); *Whitley v. Senkowski*, 317 F.3d 223, 225 (2d Cir. 2003). In addition, "prisoners asserting innocence as a gateway to defaulted claims must establish that, in light of new evidence, 'it is more likely than not that

11

no reasonable juror would have found petitioner guilty beyond a reasonable doubt.'" *House*, 547 U.S. at 536-37 (quoting *Schlup*, 513 U.S. at 327);[4] *see also Doe*, 391 F.3d at 160-62.

Petitioner's claim fails from the outset because he admits that it is not supported by any new evidence. Pet. at 8. Consequently, any assertion of actual innocence is impossible to establish. *See Goodman v. Collado*, No 1:18-CV-2769, 2021 WL 4893676, at *5 (E.D.N.Y. Oct. 20, 2021) (concluding that claims of actual innocence "face[] an insurmountable obstacle [when] . . . there is no new evidence."); *Soler v. United States*, No 1:10-CV-4343, 2010 WL 5173858, at *4 (S.D.N.Y. Dec. 20, 2010) (holding claim of actual innocence was incredible where petitioner "present[ed] no new evidence and instead just highlight[ed] a small portion [of trial testimony.]"); *see also Romero v. Senkowski*, 950 F. Supp. 573, 583 (S.D.N.Y. 1996) ("[Petitioner] presents no new evidence in support of his claim of actual innocence. Because [petitioner] fails to show new evidence of his innocence . . . his . . . petition does not fall within the parameters of the fundamental miscarriage of justice exception."). Therefore, petitioner's claim remains time-barred.

Furthermore, as noted by the trial court, there was an overwhelming amount of evidence that established petitioner's guilt. This included video recordings of petitioner's own words, testimony of those with petitioner on the night of the shooting, witness testimony from those who were present during the shooting and identified petitioner given his distinctive sweatshirt, video footage from security cameras, and petitioner's own words admitting to being at the scene of the shooting and expressing his condolences to the victim's family.

---

[4] *Schlup* and *House* involved procedurally defaulted claims. *See McQuiggan*, 569 U.S. at 386. The Supreme Court in *McQuiggan* held that "actual innocence, if proved, serves as a gateway through which a petitioner may pass whether the impediment is a procedural bar, as it was in *Schlup* and *House*, or, as in this case, the expiration of the statute of limitations." *Id.*

Petitioner's conclusory assertions about the prosecution's failure to demonstrate his criminal intent is meritless. "A person is guilty of murder in the second degree when . . . with the intent to cause the death of another person, he causes the death of such person or of a third person[.]" N.Y. PENAL LAW § 125.25. The People presented evidence that petitioner's reputation was publicly tarnished and, in order to correct the embarrassment petitioner had suffered, he intended to go get retribution. His own words and actions, as expressed by himself and perceived by others both close to him and not, indicated that he intended to kill his attackers. However, after the shooting occurred, a different victim was dead. Failure to produce any new evidence refuting the aforementioned substantial body of incriminating evidence also results in petitioner's failure to demonstrate that "no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt." *McQuiggin*, 569 U.S. at 386.

In sum, petitioner does not provide any new evidence that he is actually innocent; therefore, this equitable exception also does not save petitioner's untimely filing.

**V. CONCLUSION**

**WHEREFORE**, it is

**RECOMMENDED** that respondent's motion to dismiss, Dkt. No. 14, be **GRANTED**; and it is further

**RECOMMENDED** that the petition, Dkt. No. 1, be **DENIED and DISMISSED** in its entirety**;** and it is further

**RECOMMENDED** that no Certificate of Appealability ("COA") shall issue because petitioner has failed to make a "substantial showing of the denial of a constitutional right" as

13

28 U.S.C. § 2253(c)(2) requires;[5] and it is further

**RECOMMENDED** that any further request for a Certificate of Appealability must be addressed to the Court of Appeals (Fed. R. App. P. 22(b)); and it is further

**ORDERED** that the Clerk of the Court respectfully provide petitioner with copies of the unpublished decisions cited herein in accordance with the Second Circuit decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam); and it is further

**ORDERED** that the Clerk shall serve a copy of this Report-Recommendation and Order upon the parties in accordance with the Local Rules.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); *see also* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72 & 6(a).

**DATED:** August 29, 2022

*[signature]*
Miroslav Lovric
U.S. Magistrate Judge

---

[5] *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003); *see Richardson v. Greene*, 497 F.3d 212, 217 (2d Cir. 2007) (holding that if the court denies a habeas petition on procedural grounds, "the certificate of appealability must show that jurists of reason would find debatable two issues: (1) that the district court was correct in its procedural ruling, *and* (2) that the applicant has established a valid constitutional violation" (emphasis in original)).